UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 24-CR-80011

UNITED STATES OF AMERICA

v.

JAMIE MICHAEL LARKIN,

    Defendant.
_____/

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

COMES NOW, the Defendant, Jamie Michael Larkin ("Mr. Larkin") by and through the undersigned counsel, and hereby files this Memorandum in Aid of Sentencing pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and in support thereof hereby states as follows:

### PRELIMINARY STATEMENT

The man who shall appear for sentencing before the Court in this matter is not the same as the person who got involved in Rite Care Pharmacy in early 2021. Jamie Larkin is presently a successful and responsible business owner, with over 30 employees. He is also a mentor and friend to many, as reflected in the letters of support attached hereto[1]. In the past several years, Mr. Larkin has evolved into a person who chooses his friends more wisely, scrutinizes business opportunities presented to him more carefully and with the assistance of lawyers, and has assumed the role of mentor to others. In short, he has grown up. It is this better person who stands before the Court for sentencing and who is deserving of a downward variance so that he might continue to succeed, so that his business and employees might continue to thrive, and so that he might continue to contribute meaningfully to his community.

---

[1] Please see **Composite Exhibit A** attached hereto and incorporated by reference.

Further, as shall be further discussed below, Mr. Larkin was involved in this matter by people whom he believed to be friends and who entirely misrepresented the business into which they asked Mr. Larkin to invest. Mr. Larkin did not know that his business partners were paying kickbacks or submitting bills for unnecessary medical services. He did know that he was being held out as the sole business owner, though his partners managed the business and were supposed to receive equal share in the profits of the business. Mr. Larkin certainly takes full responsibility for his role in the offense, which he understands facilitated his partners' conduct. He also takes responsibility for failing to perform any due diligence on the business. However, Mr. Larkin immediately cooperated with law enforcement when approached about the business and has continued to cooperate herein. It is thus respectfully submitted that Mr. Larkin's participation in this matter is qualitatively different than that of his partners and other defendants in similar cases. This qualitative difference is exactly of the nature that Congress intended the Courts to consider when it enacted 18 USC §3553.

*The Sentencing Guidelines*

If the Court accepts the loss amount agreed upon by the parties in the plea agreement, Mr. Larkin's total adjusted offense Level would be 15, with a criminal history Category of 3 and a Guideline range of 24-30 months. As shall be more fully argued below, it is respectfully submitted that Mr. Larkin's criminal history category does not accurately reflect his present danger of recidivism, and that a variance to a criminal history category of 1 is warranted. This would result in a Guideline range of 18-24 month. If the Court were to vary to a Criminal History Category II, the suggested guideline range would be 21-27 months.

*Requested Variance Sentence*

It is respectfully submitted that the factors summarized above, and more fully discussed below, mitigate in favor of a sentence of home confinement or a blended sentence of a shortened

2

period of imprisonment coupled with home confinement. Such a sentence would be sufficient but not greater than necessary to satisfy the enunciated goals of sentencing.

## FACTUAL BACKGROUND

As the world was slowly returning to normal after the health emergency caused by Covid, Jamie Larkin was attempting to get on his feet professionally and financially. At that time, he was approached by Patrick O'Brien and Omar Solari about investing in a new pharmacy. The pair held themselves out to be tremendously successful pharmacy owners, and they told Mr. Larkin that the pharmacy they wanted to open with him would provide a great investment opportunity. Mr. Larkin was asked to invest $115,000 into the pharmacy for an equal share of the profits (33% each), though O'Brien and Solari would manage all facets of the pharmacy operation. The pair explained that Larkin would be the "sole owner" of the pharmacy on paper because Solari and O'Brien had been audited by insurance companies in the past and they wanted to keep their interest in the pharmacy hidden to avoid such future problems. Mr. Larkin was also promised that because he would be the "sole owner" of the pharmacy, he would ultimately be able to sell the pharmacy in the future and keep all proceeds of any such future sale. Mr. Larkin was never told, and was not aware, that the pair were concealing their ownership in the pharmacy because they intended to pay unlawful kickbacks and bill Medicare for medically unnecessary services, nor did they explain that they were required to disclose their interests in the pharmacy pursuant to Medicare rules and state regulations. As reflected in the PSR at ¶¶22-23, O'Brien and Solari duped other individuals to invest in other pharmacies using the same explanations and tactics.

Though Mr. Larkin invested in the pharmacy believing that it would be providing legitimate medical services, Mr. Larkin takes full responsibility for failing to perform due diligence on the pharmacy and for permitting Solari and O'Brien to conceal their ownership. Mr. Larkin now understands the purpose of the ownership disclosure rules and recognizes the seriousness of his lapse in judgment. Mr. Larkin ultimately never received the percentage of profits that he was

3

promised. Indeed, Mr. Larkin lost approximately $45,000 in the pharmacy. It turns out that Solari and O'Brien scammed Mr. Larkin as well as Medicare, walking away with all profits.

When approached by law enforcement about Rite Care Pharmacy, Mr. Larkin was candid about what had occurred and cooperated fully with the investigation, learning for the first time what had really occurred inside the pharmacy. On February 22, 2024, Mr. Larkin took responsibility for his conduct by pleading guilty to a one-count Information charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

Both parties agree that during the period of Mr. Larkin's involvement in the crime charged, from in or around January 2021-December 2021,[2] the loss amount was $997,911, as this was the amount received by the Pharmacy during the period of Mr. Larkin's involvement.

## Objections To The Guideline Calculations

### A.    Loss

Mr. Larkin objects to the guideline loss calculation set forth in the Presentence Investigative Report, ("PSR") as it is based upon an alleged *intended* loss amount of $1,027,956 which is not supported by the facts, the Guidelines, or the parties. Both parties agree that the proper loss amount is $997,911.

### 1. *The government supports the loss amount stated in the plea agreement*

It is axiomatic that the Government bears the burden of establishing the pertinent facts in support of a sentencing enhancement by a preponderance of the evidence, which must be reasonable and specific. *U.S. v. Moran*, 778 F. 3d 942, at 973. While a court may make factual findings with respect to loss amounts based on evidence heard at trial, ***undisputed*** statements in the PSR or ***evidence presented*** during sentencing, the Court may not speculate about the existence of facts that would result in a higher sentence.(***emphasis added***) *Id*. The Government agrees that

---

[2]   *See* PSR ¶ 12.

4

the loss amount herein is as stated in the plea agreement and has not proffered evidence supporting a higher loss amount. Thus, the loss amount tendered by the parties should be determinative.

### 2. Actual Loss, not Intended Loss, is the pertinent calculation under § 2B1.1

Additionally, the text of § 2B1.1 only refers to "loss". This term is unambiguous. And though the commentary to the Guidelines state that there is "*a rebuttable presumption*" that the intended loss equals the amount the defendant billed a government agency §2B1.1, comment. (n.3(F)(viii)), the Eleventh Circuit's decisions in *Dupree* and *Kisor* definitively stand for the proposition that the commentary is only a resource as to ambiguous Guidelines terms:

> Following Supreme Court precedent, we recently held that courts should only defer to the commentary when—after exhausting all traditional tools of construction—we are left with the conclusion that the Guidelines are "genuinely ambiguous." *United States v. Dupree*, 57 F.4th 1269, 1274-75 (11th Cir. 2023) (en banc) (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-15, 204 L. Ed. 2d 841 (2019))

*Dupree*'s analysis plainly applies to any Guideline term and not just §§ 4B1.1 and 4B1.2,. *Id.* at 8. In fact, the Third Circuit in *United States v. Banks*, 55 F. 4th 246 (3rd Cir. 2022), specifically held the *Kisor* analysis applies to § 2B1.1, in holding that actual loss—not intended loss—is the only driver for a sentencing enhancement under § 2B1.1. Indeed, Judge Ruiz followed the rationale of *Banks* recently in *United States v. Minal Patel*, 2023 WL 5453747 (S.D. Fla. Aug. 23, 2023).

Declining to follow the reasoning in *Banks* and *Patel,* Judge Grimberg, out of the Northern District of Georgia, did find the term "loss" ambiguous, and consulted the Commentary to determine loss in *United States v. Syme*, No. CR 1:23-CV-00205-SDG, 2024 WL 1053295. However, the Court importantly pointed out that,

> "*[T]he Commentary defines "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict*." U.S.S.G. § 2B1.1, cmt. n.3(A)(iii) (*emphasis added*). Put differently, a defendant causes an intended loss only where he acts with the *purpose* of inflicting pecuniary

5

harm. Thus, to determine intended loss, courts must inquire into the defendant's *purpose*—they must peer into the defendant's mind and determine his subjective intent." (**Emphasis added**)

*Syme* at *4

The Eleventh Circuit has consistently applied this standard. Indeed, the Eleventh Circuit has distinguished between loss in cases of theft, where "there is almost always an *intent* to deprive the victim of the value of the property taken," and loss in certain kinds of fraud, where "the perpetrator ... *intend[s]* no loss." *United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998) (emphasis added). It has further instructed that loss in fraud cases depends on the "nature of the scheme." *Orton*, 73 F.3d at 334. The Eleventh Circuit has accordingly implied that the intended loss would be zero where a perpetrator obtains a contract through fraud, but fully "intends to perform and to cause no loss to the victim."

*Id.*

Thus, whether the commentary applies or not, the facts firmly establish that Mr. Larkin had no intent vis a vis the billing at issue since he did not participate in the management of the pharmacy and was not aware of the fraudulent intent of his partners vis a vis the billing submissions. Therefore, under any analysis, *because Mr. Larkin did not intend to transmit fraudulent billings* for unnecessary services to Medicare, Mr. Larkin's loss amount should be driven by the amount received, which is the amount agreed to by the parties.

**B.  The two-point enhancement for loss of more than $1,000,000 to a Government healthcare program under § 2B1.1(b)(7)(A)(i) does not apply**

Because the loss amount at issue herein is appropriately $997,911, it is below the $1,000,000 necessary to trigger the enhancement under § 2B1.1(b)(7)(A)(i). As a result, the proper total adjusted offense level herein is 15.

### MEMORANDUM OF LAW IN SUPPORT OF DOWNWARD VARIANCE

Pursuant to *United States v. Booker*, 543 U.S. 220, 245-67 (2005), sentencing courts are unencumbered in their ability "to consider every convicted person as an individual and every case

6

as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[3] *Gall v. United States*, 552 U.S. 38, 53 (2007) (*quoting Koon v. United States*, 518 U.S. 81 (1996)). To guide a court's discretion, 18 U.S.C. § 3553 (a) requires sentencing courts to consider the advisory Guideline range and the facts of the specific case through the lens of seven factors, including:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) The need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to prove just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established;
> (5) any pertinent [Sentencing Commission] policy statement;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553 (a) (1) - (7).

Further, § 3553(a) and the "parsimony provision" mandate that the court "impose a sentence sufficient but not greater than necessary." It is respectfully submitted that these factors mitigate in favor of a downward variance to home confinement or a combination of a shortened period of incarceration coupled with home confinement and 3 years supervised release.

---

[3] *Booker* rendered the United States Sentencing Guidelines "effectively advisory." Though sentencing courts are required to consider a Defendant's guideline range, they may tailor the sentence in light of other statutory concerns as well." *Id.* at 220, 222.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mr. Larkin most certainly did not scrutinize the opportunity presented to him when investing in Rite Care Pharmacy. And like others who were duped by O'Brien and Solari, Mr. Larkin truly believed that the pharmacy in which he invested was a legitimate enterprise. He did not understand that unlike in other businesses, "silent partners" are prohibited in the health care arena, nor did he understand the true purpose of the concealment. However, he understands that he was willfully blind to his partners' scheme and should have consulted with attorneys. He also understands that his involvement permitted Solari and O'Brien to pursue their fraudulent scheme. However, it is respectfully submitted that his involvement is qualitatively different than that of Solari and O'Brien and does not implicate the need for deterrence or a period of incarceration.

It is also respectfully submitted that Mr. Larkin's Criminal history, which reflects the immaturity and recklessness of his past but not the propensity to commit crime in the future, is not instructive here. It is submitted that the only probative conduct is the 2022 conviction for money laundering involving the sale of testosterone which occurred during the same time-frame as the instant matter. Accordingly, it is respectfully submitted that the Court should disregard the majority of this distant conduct, and vary to a Criminal History Category I, which would account for his 2022 conviction.

### B. The Need for the Sentence imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

In imposing "just punishment" for an offense, a sentencing court should impose a sentence "that is not greater than necessary" and consider other enunciated goals of sentencing. 18 USC §3553(a). It is respectfully submitted that the recommended guideline sentence overstates the Mr. Larkin's conduct in the instant case (which is qualitatively different, as discussed above, than other

8

defendants with similar guidelines in similar cases) and that such a sentence is not necessary to promote respect for the law.

1. **Deterrence**

It is respectfully submitted that Mr. Larkin does not need a punishment of incarceration to drive home the lesson learned here. He has lost significant sums of money, will now owe restitution of close to $1,000,000, and is again facing the consequences of his prior immaturity.

*(a) General Deterrence*

The principle of general deterrence is based on the unsupported premise that prison sentences deter crime. This misconception has resulted in the mass incarceration plaguing the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period than any other democracy.[4] In

---

[4] "The high United States incarceration rate is unparalleled internationally. Our national prison population of 1.6 million people is the world's largest—larger even than that of China…"; *See, United States v. Bannister*, 786 F.Supp. 2d 617, 650 (E.D. New York 2011);

"By all accounts, these "tough on crime" policies have been an abject failure. A rapidly accumulating group of multidisciplinary research studies have come to the conclusion that the rate of incarceration in the United States needs to be significantly reduced, and both the executive and legislative branches seem to agree. As a recent study prepared by the research arm of the National Academy of Sciences put it, the United States has "gone past the point where the numbers of people in prison can be justified by social benefits," and arrived at a point where mass incarceration itself is a major "source of injustice." Citing National Research Council, J. Travis, et al., *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 9 (2014) ("National Research Council Report"). *See*, *United States v. Valdovinos*, 760 F.3d 322,331 (4th Cir. 2014). Quoting Justice Kennedy, "Our resources are misspent, our punishments too severe, our sentences too long." *Id.; see also*
https://bjs.ojp.gov/library/publications/federal-prisoner-statistics-collected-under-first-step-act-2023; https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/BOP_January2024.pdf;
https://www.sentencingproject.org/research/?gad_source=1&gclid=CjwKCAjwmrqzBhAoEiwAXVpgoh__USgwnnk6Q057r0dVRD2GYWrwE_ImBaftILNKi0IlJD1bP-GVHxoCY3UQAvD_BwE ; https://www.statista.com/statistics/203718/number-of-prisoners-in-the-us/ ; https://www.themarshallproject.org/2020/11/11/the-united-states-of-incarceration?gad_source=1&gclid=CjwKCAjwmrqzBhAoEiwAXVpgopkfw6NIQQXZr5AEpKam4UgcLQJMKwq0FMacdCxgmo5IyQ8AmbN4bhoCN7oQAvD_BwE

9

> fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970…[The] archipelago of prisons and jails costs more than $80 billion annually—about equivalent to the budge of the federal Department of Education.

Dr. Oliver Roeder at al., *What Cause the Crime Decline*?, Brennan Center for Justice, 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter.org/our-work/research-reports/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom?,"* 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> There is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appear to be weak to nonexistent.

*Id.* at 1031.

The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. Of Justice, *Five Things About Deterrence* (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter crime. *See id; see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission f crimes.")

**(b) Specific Deterrence**

Like general deterrence, the empirical evidence does not establish a correlation between the length of a sentence and specific deterrence. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). The 2016 study

by the National Institute of Corrections establishes three critical tenets. First, incarceration has a negligible impact on crime prevention. Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *Id.* There is, in fact, strong evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older, more serious offenders—leads to increased recidivism. *See The Criminogenic Effects of Imprisonment: Evidence from State Panel Data* 1974-2002, 6 Criminology & Public Policy 589 (2007). Moreover, harsh penalties do not improve the long-term outcomes of the offender. *See* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance.") Finally, the study concludes that community correction programs are more effective in reducing recidivism. *Id.*

Moreover, the United States Sentencing Commission has determined "[t]here is no correlation between recidivism and guidelines' offense level. . .While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." See U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at p. 15 (May 2004). In sum, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen, et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

### C. The Kinds of Sentences Available

A mandatory minimum sentence does not apply to Mr. Larkin. Thus, any sentence below the advisory guideline range is permissible. The critical question in Mr. Larkin's case is the exact weight that this Court should give the guidelines. As recognized in *Gall*, the courts "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586 (2007).

Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases, are now relevant in every case.

### 1. Sentences should be no longer than necessary and implemented in a way that avoids disparate sentencing.

"The Supreme Court has emphasized that the advisory guideline system should [']continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.[']" Cite Commission. (citing *U.S. v. Booker*, 543 U.S. 220, 264-65 (2005)). A sentence should "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct[.]". 28 U.S.C. § 991 (b) (1) (B). The focus of the sentence imposed is whether it is reasonable and achieves the purposes of § 3553 (a). *U.S. v. Arevalo-Juarez*, 464 F. 3d 1246, 1249 (2006).

The guidelines, particularly in fraud cases, call for extraordinarily long sentences of imprisonment. They are not the product of empirical data of past practice, they are not based on national experience, nor are they reflective of the individual issues present in every case. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1.—thus failing to fulfill its institutional role—this Court is free to disagree with its recommendation. *See Pepper v. United States*, 552 U.S. 1089 (2011); *Spears v. United States*, 129 S. Ct. 840 (2009); *Kimbrough*, 552 U.S. 101 (year); *Rita*, 551 U.S. 338(2007).

### 2. Public Policy

The Guidelines provide a false promise of predictability and fairness. One district court aptly noted:

> Criminal behavior can fuel public outcry and drive broad legislative and executive agendas to get "tough on crime." But how does that translate to specific instances? If you take a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor

12

> it purportedly to address almost every eventuality, you get "justice" dictated in advance, marked by visceral condemnation, and based on the pretense of omniscience.

*United States v. Williams*, 372 F. Supp. 2d 1335, 1337-1338 (M.D. Fla. 2005) (Presnell, J.)[5]

Because we believe the guidelines to be the product of great deliberation and reasoned judgment, we often assume they provide clear direction for the proper sentencing of every criminal defendant. But the guidelines have often, and dramatically, failed our justice system in creating fundamentally unjust results. For example, the guidelines created the crack-cocaine disparity.[6] Likewise, the fraud guidelines are just as unjust and misguided as they are not the produce of careful study or empirical evidence, and often lead to sentences far exceeding those for violent offenders. Consequently, the fraud guidelines do not reflect an approximation of sentences that might achieve § 3553's objectives. In *Rita*, the Supreme Court stated that it may be "fair to assume" the guidelines "reflect a rough approximation" of sentences that might achieve § 3553's objectives. *Rita*, 551 U.S. at 338.

### 3. Victim Restitution

Under the Mandatory Victims Restitution Act, a defendant convicted of fraud must pay restitution to victims of the offense. *United States v. Bane*, 720 F.3d 818, 827 (11th Cir. 2013). "Restitution must be based on the amount of loss actually caused by the defendant's conduct" (*United States v. Baldwin*, 774 F. 3d 711, 728 (11th Cir. 2014)), and reduced by the value of legitimate medical services provided" (*Bane*, 720 F. 3d at 828). *United States v. Moss*, 30 F. 4th 1271 (11th Cir. 2022). In this case, though Mr. Larkin did not intend to bill for unnecessary medical services, and lost money due to his investment, Mr. Larkin is now saddled with a restitution of

---

[5] Though reversed by *United States v. Williams*, 456 F. 3d 1353 (11th Cir. 2006), the Eleventh Circuit was overruled by the United States Supreme Court in *Kimbrough v. United States*, 552 U.S. 1353 (2010).

13

close to a million dollars. This alone is a punishment that will last for years and act as a general and specific deterrent to criminal conduct.

## CONCLUSION

As the foregoing establishes, the circumstances presented in Mr. Larkin's case warrant a downward variance. Because the decision in *Booker* has made the Guidelines advisory, and the parsimony clause of 18 U.S.C. § 3553 (a) the paramount consideration, Mr. Larkin respectfully requests that this Court exercise its discretion in granting a variance from the Guidelines and impose a sentence of home confinement coupled with three (3) years of Supervised release and that such sentence is sufficient but not greater than necessary to satisfy the enunciated goals of sentencing.

Dated: June 17, 2024　　　　　　　　　　Respectfully submitted,

**KUDMAN TRACHTEN ALOE POSNER LLP**

Tama Beth Kudman, Esq.
7108 Fairway Drive, Suite 130
Palm Beach Gardens, Florida 33418
Tel: (561) 472-0811; Facsimile: (561) 828-0210
Florida Bar No. 637432
tkudman@kudmanlaw.com

By: /s/ Tama Kudman

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been served via email transmission to all counsel of record on June 17, 2024.

By: /s/ Tama Kudman